# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |
|---|---|
| STEPHEN BUSHANSKY, Derivatively on behalf of KRISPY KREME, INC.<br><br>Plaintiff,<br><br>vs.<br><br>JOSHUA CHARLESWORTH, JEREMIAH ASHUKIAN, MARISSA ANDRADA, PATRICIA CAPEL, DAVID DENO, GERHARD PLEUHS, DAVID BELL, OLIVIER GOUDET, PAUL MICHAELS, DEBBIE S. ROBERTS, PHILIP TELFER, MICHELLE WEESE, PATRICK GRISMER, BERNARDO HEES, EASWARAN SUNDARAM, and GORDON VON BRETTEN<br><br>Defendants,<br><br>and<br><br>KRISPY KREME, INC.,<br><br>Nominal Defendant. | Case No.: 25-621<br><br><br>JURY TRIAL DEMANDED |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Stephen Bushansky ("Plaintiff"), by his undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Krispy Kreme, Inc. ("Krispy Kreme" or the "Company") against the current members of the Company's Board of Directors (the "Board"), its former Chief Financial Officer ("CFO") and certain former directors of the Company (the "Individual Defendants") for violations of the federal securities laws, breaches of their fiduciary duties, and other misconduct that has materially damaged the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by

1

Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities fraud class action complaints filed against the Company, and its Chief Executive Officer ("CEO") and former CFO, transcripts of the Company's conference calls with financial analysts and investors, published news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Krispy Kreme is a premier retailer and wholesaler of doughnuts, coffee, and related products, operating through a combined network of company-owned stores and franchises. In recent years, Krispy Kreme entered into a high-profile strategic partnership with McDonald's Corporation ("McDonald's") to supply doughnuts to McDonald's locations—an initiative heavily promoted to investors as a major growth opportunity and key driver of the Company's future performance. Following an initial testing phase, Krispy Kreme and McDonald's expanded their partnership nationwide, with a phased rollout scheduled to commence in the second half of 2024.

2.    However, the Individual Defendants breached their fiduciary duties to Krispy Kreme and its stockholders by mismanaging the Company's strategic partnership with McDonald's through a failure to implement adequate internal controls to monitor and manage the substantial operational and financial risks posed by the partnership. This mismanagement exposed Krispy Kreme to significant operational failures, supply chain disruptions, and financial liability, putting the Company's reputation, financial stability, and shareholder value at risk.

3.     The mismanagement involved inadequate risk assessment and mitigation regarding the operational challenges posed by scaling production to meet McDonald's requirements, poor strategic oversight of the partnership's implementation, and lack of proper governance mechanisms to ensure the partnership's alignment with shareholder interests. The Individual Defendants failed to establish sufficient internal controls to monitor the risks associated with the McDonald's expansion such as costs, service and quality inconsistencies, demand fluctuations, and delivery logistics, that were crucial for the partnership's success, resulting in operational failures that undermined the partnership's viability and the Company's financial performance.

4.     To conceal their breach of fiduciary duty and the Company's operational failures related to the McDonald's partnership, the Individual Defendants made or allowed the dissemination of false and misleading statements to investors and the market. This deception became particularly critical as operational problems mounted, and the partnership's performance fell short of public expectations. The Individual Defendants deliberately concealed the true extent of the internal control failures and risk management deficiencies and downplayed the severity of the risks associated with the McDonald's expansion such as costs, service and quality inconsistencies, demand fluctuations, and delivery logistics . Krispy Kreme issued robust financial guidance for 2024 and 2025, despite knowing that the underlying operational infrastructure was inadequate to support the partnership's requirements, creating a false impression of the Company's capabilities and future prospects.

5.     When in February 2025, the Company reported a decline in net revenue of more than 10%, Krispy Kreme's CEO and President Joshua Charlesworth ("Charlesworth") merely doubled down on the deception and emphasized that the rollout was "on track" and feedback from

McDonald's was "very positive," and represented that the Company was poised for continued growth. Defendant Charlesworth also characterized any demand softening as manageable.

6. In May 2025, the Company reported disappointing financial results for the first quarter, reporting a "net loss of $33.4 million, compared to prior year net loss of $6.7 million" and a 15.3% decline in revenue. In a conference call with financial analysts and investors, Defendant Charlesworth admitted that the partnership was floundering following the "initial marketing launch" with a drop in demand and a required "intervention to deliver sustainable profitable growth" and noted that the partnership's deployment schedule was being reassessed. CFO Jeremiah Ashukian ("Ashukian") also acknowledged additional concerning financial metrics and stated that the Company was withdrawing its full year 2025 financial guidance.

7. Following the disclosure of the failed partnership and the Company's true financial condition, Krispy Kreme's stock plummeted by nearly 25% in one day and shortly thereafter, securities class action lawsuits began to be filed against the Company and its CEO and CFO. As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself, as well as its officers.

8. In June 2025, Krispy Kreme announced that it and McDonald's had mutually agreed to end their partnership. On the heels of this news, Defendant Ashukian suddenly resigned from his position as CFO and the Company's Chief Growth Officer also resigned.

9. The Individual Defendants' breach of fiduciary duty through their failure to implement adequate internal controls in connection with the McDonald's partnership and subsequent cover-up has caused severe harm to Krispy Kreme and its stockholders by not only exposing the Company to legal liability but have also damaging its reputation and relationships

with key strategic partners, undermining the Company's long-term growth prospects and competitive position in the market.

10.     Plaintiff did not make a demand prior to bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent.  In the absence of this action, Krispy Kreme will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.     JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 20(a) and 14(a) of the Exchange Act of 1934 ("the Exchange Act"), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This Court has jurisdiction over each Defendant named herein because each Defendant is either incorporated and maintains operations within this District or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), where the Company maintains its principal executive offices and conducts substantial business. Further, the Securities Class Actions and the Antitrust Class Action are pending in this District.

## III.     PARTIES

### A. Plaintiff

14. Plaintiff Stephen Bushansky is, and has been a shareholder of Krispy Kreme since the Company's initial public offering, and has held Krispy Kreme common stock continuously since that time. As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B. Defendants

#### 1. Nominal Defendant

15. Nominal Defendant Krispy Kreme is a Delaware Corporation with its principal executive offices located at 2116 Hawkins Street, Charlotte, North Carolina 28203. The Company's common stock trades on the NASDAQ under the ticker symbol "DNUT."

#### 2. Individual Defendants

16. Defendant Charlesworth has been the CEO, President, and a director of Krispy Kreme since January 2024. Previously, Charlesworth served as Global President from June 2022 to December 2023, Chief Operating Officer from May 2019 to December 2023, CFO from April 2017 to January 2023, and Corporate Secretary from July 2018 to August 2020. In 2024, Charlesworth received the following compensation:

| Year | Salary | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|--------------|---------------|------------------------|-------|
| 2024 | $999,039 | $1,000,012 | N/A | $511,404 | $2,510,455 |

17. Defendant Ashukian was CFO and Executive Vice President of Krispy Kreme from January 2023 until his resignation on July 11, 2025. In 2024, Ashukian received the following compensation:

| Year | Salary | Stock Awards | Option Awards | All Other Compensation | Total |
|------|--------|--------------|---------------|------------------------|-------|
| 2024 | $650,000 | $1,125,021 | N/A | $2,465 | $1,777,486 |

18.     Defendant Marissa Andrada ("Andrada") is a Krispy Kreme director since February 2022 and is the Chair of the Remuneration and Nomination Committee. In 2024, Andrada received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|------------------------------|--------------|------------------------|-------|
| 2024 | $70,000 | $100,013 | N/A | $170,013 |

19.     Defendant Patricia Capel ("Capel") is a Krispy Kreme director since June 2024 and is Chair of the Board. Capel is also a Senior Partner at JAB Holding Company ("JAB"), which owns approximately 44% of Krispy Kreme common stock, and serves as its anchor shareholder, having taken the Company private in 2016 and later returning it to the public markets in 2021. In 2024, Capel received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|------------------------------|--------------|------------------------|-------|
| 2024 | $30,000 | N/A | N/A | $30,000 |

20.     Defendant David Deno ("Deno") is a Krispy Kreme director since September 2016 and is Chair of the Audit and Finance Committee. In 2024, Deno received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|------------------------------|--------------|------------------------|-------|
| 2024 | $75,000 | $100,013 | N/A | $175,013 |

21.     Defendant Gerhard Pleuhs ("Pleuhs") is a Krispy Kreme director since June 2022 and is the Lead Independent Director since 2025. Pleuhs is a member of the Audit and Finance Committee and the Remuneration and Nomination Committee. In 2024, Pleuhs received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $70,000 | $100,013 | N/A | $170,013 |

22.     Defendant David Bell ("Bell") was a Krispy Kreme director from September 2016 to June 2025. Bell was also a Senior Partner at JAB from March 2021 to March 2025, which owns approximately 44% of Krispy Kreme common stock and serves as its anchor shareholder, having taken the Company private in 2016 and later returning it to the public markets in 2021. In 2024, Bell received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $60,000 | $100,013 | N/A | $160,013 |

23.     Defendant Olivier Goudet ("Goudet") was a Krispy Kreme director from September 2016 to June 2025. Goudet is also a Senior Investment Advisor at JAB and was previously Managing Partner and CEO, which owns approximately 44% of Krispy Kreme common stock and serves as its anchor shareholder, having taken the Company private in 2016 and later returning it to the public markets in 2021. In 2024, Goudet received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $200,000 | $255,010 | N/A | $455,010 |

24.     Defendant Paul Michaels ("Michaels") was a Krispy Kreme director from May 2017 to June 2025. In 2024, Michaels received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $90,000 | $100,013 | N/A | $190,013 |

25.     Defendant Debbie S. Roberts ("Roberts") was a Krispy Kreme director from April 2021 to June 2025. In 2024, Roberts received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $60,000 | $100,013 | N/A | $160,013 |

26.     Defendant Philip Telfer ("Telfer") was a Krispy Kreme director from September 2022 to June 2025. In 2024, Telfer received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $65,000 | $100,013 | N/A | $165,013 |

27.     Defendant Michelle Weese ("Weese") was a Krispy Kreme director December 2020 to June 2025. In 2024, Weese received the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2024 | $60,000 | $100,013 | N/A | $160,013 |

28.     Defendant Patrick Grismer ("Grismer") is a Krispy Kreme director since June 2025 and is a member of the Audit & Finance Committee.

29.     Defendant Bernardo Hees ("Hees") is a Krispy Kreme director since June 2025.

30.     Defendant Easwaran Sundaram ("Sundaram") is a Krispy Kreme director since June 2025.

31.     Defendant Gordon von Bretten ("von Bretten") is a Krispy Kreme director since June 2025. Von Bretten is also a Senior Partner at JAB, which owns approximately 44% of Krispy Kreme common stock and serves as its anchor shareholder, having taken the Company private in 2016 and later returning it to the public markets in 2021.

32.     Defendants Ashukian, Andrada, Capel, Charlesworth, Deno, Pleuhs, Bell, Goudet, Michaels, Roberts, Telfer, Weese, Grismer, Hees, Sundaram, and von Bretten are referred to as the "Individual Defendants."

## IV. THE INDIVIDUAL DEFENDANTS' DUTIES

33. By reason of their positions as current or former officers or directors of Krispy Kreme and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and/or owe to Krispy Kreme and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Inari in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Krispy Kreme and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

34. The Individual Defendants, because of their positions of control and authority as directors and officers of Krispy Kreme, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

35. As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the Nasdaq, the Individual Defendants also owed a duty to ensure the reporting of accurate, complete, and truthful information concerning Krispy Kreme's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Krispy Kreme's management, policies, and internal controls.

36. At all times relevant hereto, the Individual Defendants were the agents of each other and Krispy Kreme and were always acting within the course and scope of such agency.

37.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Krispy Kreme.

**A.  Additional Duties Under Krispy Kreme's Code Of Conduct**

38.     Krispy Kreme's Code of Conduct applies to the Company's directors, officers, and employees.

39.     The Code of Conduct highlights the Company's commitment to the highest of ethical standards and strict observance of all laws, regulations, and policies applicable to the Company and its business, and "provides a framework for making ethical choices."

40.     The Code of Conduct encourages all directors, officers and employees to report any potential violations of the Code of Conduct to a supervisor, HR, the Legal Department, or the Krispy Kreme Whistleblower hotline.

41.     The Code of Conduct mandates accurate accounting and financial reporting:

We are committed to providing, full fair, accurate, timely, and understandable disclosure of relevant information to our investors and the Securities and Exchange Commission. We have legal obligations, and it's important to remember that fraudulent or misleading reporting or improper transactions can result in civil or criminal penalties to the individuals involved and to the company.

All transactions must be properly approved and accurately reflected on our books and records, accounting, and financial reporting. Estimates and guidance on future performance, though subject to many uncertainties and risks, should be based on good faith views at the time made. You should also report any error, deficiency or non-compliance with our internal accounting controls.

Our responsibility to be accurate, honest, and complete also applies to day-to-day recordkeeping, such as time clock entries and expense requests. It is never acceptable to take any part, no matter how small your role, in any activity that involves theft, fraud, embezzlement, or misappropriation of company property. Your participation in fraud occurs any time you help conceal, alter, falsify, or omit information in records either for your benefit or at the direction of others. This includes following the rules of reimbursement for business related travel and expenses.

42.     The Code of Conduct mandates the disclosure and proper management of conflicts of interest, stating: "We believe in conducting business with integrity, while avoiding conflicts of interest." It further states:

> A conflict of interest occurs when a Krispy Kremer's personal interests conflict or interfere with Krispy Kreme's interests. Certain personal or professional relationships, financial interests, and other employment opportunities could create a conflict of interest and affect your ability to make decisions at work objectively.

**B.     Additional Duties Of Audit Committee Members**

43.     The Audit Committee Charter sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things, internal audit, financial reporting and legal matters; the integrity of the Company's financial statements; and the Company's compliance with legal and regulatory requirements.

44.     The Audit Committee members are required to, among other things:

- To oversee: the integrity of the Company's financial reporting process and systems of internal controls, including the integrity of the Company's financial statements; compliance with the Company's Code of Conduct and laws and regulations; and the independence, qualifications and performance of the Company's independent auditors and internal audit department.

- Appoint the independent auditors to audit the financial statements of the Company.

- Evaluate, together with management, the performance of the independent auditors and, where appropriate, replace such auditors.  At least annually, obtain and review a report by the independent auditors describing the independent auditors' internal quality-control procedures, including any material issues raised by the most recent quality-control review, or peer review, or by any inquiry or investigation conducted by governmental or professional authorities during the preceding five years with respect to independent audits carried out by the independent auditors, and any steps taken to deal with such issues.

- Meet to review the annual and quarterly financial statements and discuss them with management and the independent auditors, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."  These discussions shall include the matters required to be discussed under

applicable rules of the Public Company Accounting Oversight Board and the SEC, and other such inquiries as the Committee or the independent auditors shall deem appropriate. Based on such review and discussion, the Committee shall (a) approve the inclusion of the Company's unaudited financial statements in the quarterly report on Form 10-Q and (b) recommend to the Board whether the Company's audited financial statements should be included in the annual report on Form 10-K.

- Review and discuss earnings to be issued in the Company's press releases, and periodically review the Company's corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

- Discuss with the auditors the nature and rigor of the audit process, receive and review audit reports, receive the recommendation of management as to the fee to be paid to the independent auditors, and provide the auditors full access to the Committee (and the Board) to report on any and all appropriate matters.

- Review and discuss with management and the independent auditors the results of the annual audit, any audit problems or difficulties, and management's response prior to the filing of the annual report on Form 10-K.

- Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures to ensure that policies are in place to ensure the accuracy of required and voluntary disclosures.

- Discuss with management, the internal auditors and the independent auditors the quality and adequacy of and compliance with the Company's internal controls, 3 including any material weaknesses, significant deficiencies and significant changes in internal controls. Areas of discussion shall include (a) the reliability of financial reporting; (b) the compliance with applicable codes, policies, laws, and regulations; (c) the preservation of the Company's assets; (d) any special steps adopted in light of material control deficiencies; and (e) the adequacy of disclosures about changes in internal control over financial reporting.

- Review periodically the Company's financial condition and financing plans, including debt covenant compliance, proposed significant borrowings, and sources and uses of cash.

- Review significant developments in accounting rules. The Committee will review with management recommended changes in the Company's accounting or financial statements and, with the independent auditors, any significant proposed changes in accounting principles, financial statements, and critical accounting matters.

- Periodically review the Company's policy with respect to conflicts of interest and compliance with the policy. The Committee will review compliance with Company policies and procedures with respect to officers' expense accounts and perquisites, including their use of corporate assets, and consider the results of any review of these areas by the internal or independent auditors. The Committee will review significant questionable payments, if any.

- Review and discuss the Company's practices with respect to risk assessment and risk management, and oversee and evaluate the Company's risk management policies in light of the Company's business strategy, capital strength, and overall risk tolerance. The Committee also will evaluate on a periodic basis the Company's investment and derivatives risk management policies, including the internal system to review operational risks, procedures for derivatives investment and trading, and safeguards to ensure compliance with procedures.

## V. SUBSTANTIVE ALLEGATIONS

45. Krispy Kreme operates as one of the world's most recognizable sweet treat brands, with its Original Glazed doughnut achieving universal recognition. The Company operates in more than forty countries through its network of fresh doughnut shops, partnerships with leading retailers, and a rapidly growing digital business encompassing more than 17,500 fresh points of access.

46. Krispy Kreme has three operating segments: U.S., International, and Market Development. The Company delivers doughnut experiences through various channels including hot light theater and fresh shops, fresh daily branded cabinets within grocery and convenience stores, quick service restaurants, club memberships, drug stores, and digital platforms.

### A. Genesis of the McDonald's Partnership

#### 1. Initial Testing Phase

47. On October 26, 2022, Krispy Kreme initiated a strategic test program whereby doughnuts would be sold in McDonald's restaurants in and around Louisville, Kentucky. This pilot

program represented the Company's first significant foray into the quick service restaurant channel with a major national partner.

### 2. Nationwide Partnership Announcement and Exclusivity Commitment

48.     On March 26, 2024, Krispy Kreme filed with the SEC a Current Report on Form 8-K and attached a joint press release with McDonald's announcing the two companies' decision to expand their partnership nationwide, with the phased rollout scheduled to commence in the second half of 2024. The companies characterized the initial test as highly successful, stating "[t]his follows a successful test at 160 McDonald's restaurants in the Lexington and Louisville, Kentucky areas where **consumer excitement and demand exceeded expectations**."[1]

49.     The press release emphasized Krispy Kreme's preparation efforts for the national expansion:

> Krispy Kreme has been scaling its supply chain, building a support team, adding technology and new equipment, and enhancing field training to support its Delivered Fresh Daily expansion, which includes this phased rollout.

50.     Defendant Charlesworth expressed ambitious expectations for the transformational impact of the partnership: "The top request we receive from consumers, every day, is, 'please bring Krispy Kreme to my town.' Partnering with McDonald's on a national scale will provide our fans and doughnut lovers unprecedented daily access to fresh doughnuts and the joy that is Krispy Kreme."

51.     Charlesworth further emphasized the strategic importance of the partnership for the Company's growth trajectory:

> Significantly, by making Krispy Kreme accessible to fans nationwide through this partnership, we expect to more than double our points of access by the end of 2026. The partnership accelerates the development of our existing Delivered Fresh Daily

---

[1] All emphasis is added unless otherwise noted.

channel, creating operating leverage through distribution density and production utilization.

52. The announcement caused Krispy Kreme's stock to surge nearly 40% in a single day, its largest-ever one-day gain, as investors celebrated the perceived coup. Shortly thereafter, analysts from Citi and Piper Sandler, among others, upgraded the stock, citing the massive expansion of its potential customer base. Analysts Brian Mullan and Aisling Grueninger described the partnership as a "game changer" for Krispy Kreme and expected the narrative around the stock to improve.

**B.     The Company And Its Directors And Officers Continue To Promote The McDonald Partnership and Promise Further Expansion**

**1.     First Quarter 2024 Results and Guidance**

53. On May 9, 2024, Krispy Kreme issued a press release reporting its first quarter 2024 financial results and reaffirmed its full year 2024 guidance. Defendant Charlesworth stated his excitement about the McDonald's agreement, declaring it "expected to add more than 12,000 new points of access in the U.S. by the end of 2026" and emphasizing that the Company would "support much of this nationwide rollout using existing capacity, while adding distribution with other major customers as we grow".

54. On a conference call with financial analysts and investors that same day, Defendant Charlesworth provided extensive details about Krispy Kreme's expansion plan with the McDonald's partnership as a springboard:

> [F]ollowing our recent announcement to provide fresh doughnuts daily at McDonald's restaurants in the U.S. . . . [w]e have raised our long-term global points of access goal from 75,000 to 100,000 to improve the quick service restaurant opportunity. Our pace of expansion is also accelerating. For the past three years, our global points of access grew by an average 19% per year to just over 14,000 by the end of 2023. Looking ahead, we expect fresh Krispy Kreme doughnuts to be available in 33,000 points of access already by the end of 2026.

55.     Defendant Charlesworth touted the scope and transformational scale of the McDonald's rollout stating that the agreement with McDonald's was "expected to bring Krispy Kreme to more than 12,000 of their U.S. restaurants by the end of 2026" and that Krispy Kreme donuts would be available in restaurant, by drive-thru, and on their mobile app.

56.     When questioned about the financial commitment and potential risks stemming from the partnership, Defendant Charlesworth confirmed the ambitious rollout timeline and expressed confidence in the partnership:

> McDonald's has been a great partner so far and we've really enjoyed the collaboration. The agreement last[s] 1 year after the last rollout in 2026 and, of course, can be renewed after that. . . . But the partnership is going really great so far after what was obviously a great Kentucky test and very thorough test that demonstrated the consumer demand outstripped both theirs and our expectations.

57.     Defendant Ashukian addressed startup costs and investment timing, assuring investors about the financial management of the expanded partnership and the revenue impact:

> While investing in our U.S. expansion, including start-up costs for the McDonald's national rollout, we expect to deliver positive operating leverage. . . . We are collaborating with McDonald's to build a detailed rollout plan and anticipate the launch to start in the tail end of 2024. So from a revenue impact, we do expect that to be fairly minimal this year. What I would say with respect to cost, we are, as you mentioned, in the investment phase now and are incurring start-up costs and SG&A and OpEx. We're not disclosing exactly how much we're spending on that, but we are pleased that we can reaffirm our guidance, assuming those costs are in our business beginning in Q1.

58.     When asked about national expansion opportunities, Defendant Charlesworth emphasized the catalyst effect of the McDonald's partnership:

> Yes, by distributing to almost every McDonald's in the country, this does indeed give us the opportunity to profitably add distribution with other major customers, both existing customers that we are underpenetrated in and indeed new ones. And I think the conversations that we've had with them since the announcement have largely been positive because they can see that we're able to build out our operating model on a national scale and therefore, serve them nationally. I mean, it's going to be really exciting to bring, Krispy Kreme to Minneapolis, for example, the home of Target or to bring Krispy Kreme to Walmart in Arkansas. So these are things we haven't done up to now and we're really excited to do that.

## 2. Second Quarter 2024 Results and Accelerated Timeline

59. On August 8, 2024, the Company filed with the SEC a Current Report on Form 8-K and attached a press release announcing its second quarter financial results, including a 7.3% increase in net revenue to $438.8 million and a 12.1% increase to the Adjusted EBITDA to $54.7 million. Defendant Charlesworth noted that the Company had "another strong quarter" with its "innovative specialty doughnut collections" continuing to "resonate with consumers." Charlesworth also emphasized the Company's expansion efforts: "In the U.S., our profitable nationwide expansion is accelerating as we grow with existing customers and add new national partners. This includes the nationwide rollout to McDonald's, starting this fall in the Midwest with Chicago."

60. On the same day, on a conference call with financial analysts and investors, Defendant Charlesworth again promoted the upcoming national rollout and provided specific expansion targets. He outlined the comprehensive scope of the U.S. expansion strategy:

> In the U.S., our accelerated national expansion provides an opportunity to profitably densify our network. We currently have more than 8,000 points of access in the U.S. We remain on track to add more than 12,000 McDonald's and about 3,000 with partners like Walmart and Target, bringing the goal to nearly 23,000 U.S. points of access by the end of 2026.

> We are very pleased with our partnership with McDonald's. The national rollout begins this fall with the Midwest starting in Chicago. We expect to serve fresh doughnuts in more than 1,000 McDonald's restaurants by the end of the year, add 5,000 in 2025 and 6,000 in 2026, bringing us to more than 85% of their U.S. footprint.

> Our team is hard at work modernizing the making and moving of doughnuts. We have a dedicated team, partnering with our customers, including McDonald's to ensure a smooth rollout. We are hiring and training experts in manufacturing operations, upgrading our doughnut production lines, continuously improving the manufacturing process and optimizing our delivery logistics network with improved routing and upgrades to our fleet. This expansion effort will increase utilization of our production hubs and distribution density.

61.     When asked about the rollout timeline and investment costs, Defendant Charlesworth stated that the partnership with McDonald's was "going very well in general" and noted that "the rollout is on track." He further emphasized:

> We announced today that we will be first launching -- with McDonald's beyond the Kentucky pilot in the fall in Chicago and then expanding through the Midwest in the back end of this year and then obviously into next year. We expect to be in more than 1,000 McDonald's restaurants by the end of 2024. And then we have a rollout plan that we have partnered with McDonald's on through 2025 and indeed through 2026 with about 5,000 we're expecting to add generally evenly through the year of 2025.

62.     Defendant Ashukian elaborated on the comprehensive investment strategy supporting the rollout:

> To ensure a smooth rollout, we are investing ahead of the opportunity with dedicated rollout teams to support our shops and training and development costs. We're also improving capabilities across our manufacturing and operations teams and upgrading the doughnut production lines. As you can imagine, the volume that we move through. All of this has been included in our guidance. We expect to manage costs prudently and deliver margin expansion as we ramp the McDonald's network serving nearly 85% of the brand's U.S. footprint by 2026.

63.     When questioned about the catalytic effect from the partnership, Defendant Charlesworth responded that "McDonald's nationwide expansion is a bit of a catalyst for us. It enables us to really expand our DFD business faster than we would have been able to otherwise."

### 3.     Third Quarter 2024 Results and Continued Optimism

64.     On November 7, 2024, the Company filed with the SEC a Current Report on Form 8-K and attached a press release announcing its third quarter financial results, including net revenue of $379.9 million and an Adjusted EBITDA of $34.7 million. In the press release, Defendant Charlesworth emphasized strong customer feedback:

> Consumers ask us every day, 'When can you bring Krispy Kreme to my town?' hence our strategy of making our fresh doughnuts more available around the world. The successful start of our nationwide U.S. rollout at McDonald's, which began in Chicago in October and continues next week across Ohio and Indiana, is a major milestone on this journey, and we now expect to be delighting Krispy Kreme's fans

with our melt-in-your-mouth doughnuts fresh daily in nearly 2,000 McDonald's restaurants by the end of 2024.

65.    On the same day, during a conference call with financial analysts and investors, Defendant Charlesworth continued to tout the positive reception of the McDonald's nationwide rollout:

> The nationwide rollout to McDonald's has started well, with fresh doughnuts delivered daily to more than 400 McDonald's in Chicago since mid-October. . . . The consumer response has been positive, and the pace of growth accelerates from here with more than 1,000 additional restaurants launching this month alone in Ohio, Indiana, Pennsylvania and West Virginia. We're off to a strong start on our journey to meet our goal of making fresh Krispy Kreme Doughnuts available in more than 12,000 McDonald's by the end of 2026.

66.    Defendant Charlesworth emphasized the marketing support and brand benefits of the partnership:

> McDonald's is supporting the launch with a comprehensive local marketing plan, including TV, social media and out-of-home billboards. We expect this increased visibility to benefit Krispy Kreme brand awareness as we expand to more cities across the country.

67.    When questioned about revenue performance across markets, Defendant Charlesworth provided positive assessments of consumer reception:

> McDonald's customers, they're clearly excited to see our fresh doughnuts on the menu. It's more convenient for a Krispy Kreme fan to pick-up and enjoy our fresh doughnuts any time of the day. So what we're seeing so far is a really good response in line with our original assumptions.

68.    Charlesworth specifically addressed concerns about cannibalization and provided reassurances about market reception:

> We're seeing incrementality in Chicago, no obvious impact on our existing doughnut shops there and plenty of positive feedback from the McDonald's teams. And regarding the reception of the brand in Chicago, I think that the strong support McDonald's is putting behind this is no doubt part of that.

69.    Charlesworth expressed confidence in the partnership's trajectory and acceleration plans:

And indeed, you heard us reference earlier today, the confidence that we have from the success is having us sort of accelerate to serve more restaurants as fast as we can, all aligned with our strategy of becoming bigger and better. So we're really pleased with the start, both from a consumer response point of view and the reception we've got from the McDonald's team about our service and quality doughnuts.

70. When asked about consumer data and performance metrics, Defendant Charlesworth provided additional details about product tracking and customer feedback in connection with the McDonald's partnership:

What we can see is good response from the consumer. Obviously, we're making -- we can track the deliveries. We can track any that are unsold. And indeed, we can see that they clearly sold throughout the day. We're very pleased that the McDonald's team making sure that we're not out of stock and our product is well presented and always the freshest and highest quality.

71. Charlesworth also reiterated his confidence in the partnership's consumer appeal:

Everything we see gives us confidence that this resonates with the consumer. And the feedback from McDonald's definitely shows that. But indeed, they don't necessarily share all that consumer data, at least not yet. So from our point of view, it meets the need of our Krispy Kreme customer. The response has been fantastic online and directly back to us from Krispy Kreme fans. So we're feeling confident around the projections that we shared in the past.

72. Defendant Ashukian discussed the intentional cost management strategy during the rollout phase:

As I mentioned previously, no surprise on the cost front to ensure a smooth rollout. We intentionally are investing ahead of the opportunity with things like increased training and development, ensuring our teams are prepared for doughnut shop, rollout district manager level, dedicated rollout teams and overstaffing drivers to ensure availability early and ensure that we're driving service. We're also improving capabilities in manufacturing operations and upgrading doughnut production lines and our delivery logistics network.

73. When asked about margin improvements and operational management, Defendant Ashukian provided reassurances about real-time optimization:

What I can tell you is we're meeting daily as we execute the rollout of McDonald's and start to expand in different cities, just to take the learnings, as Josh kind of mentioned, and applying course correct as we go. So we feel pretty good that we're

making the right choices, trade-offs. We have an ecosystem in place where we're managing issues real time and making choices where we need to be to make sure that we're seeing the flow-through that we need to.

74.     Ashukian acknowledged the Company's substantial investment "ahead of the curve right now in the U.S." with "things like incremental equipment and facilities, repairs and maintenance . . . training and development, dedicated market roll-out teams" He noted that Krispy Kreme expected "that EBITDA margins will start to improve in the U.S. more in the back half of the year, just given some of those start-up costs."

### C.     Initial Signs of  Financial Deterioration Are Masked by Continued Promotion Of The Partnership And The Issuance Of Robust Full Year 2025 Guidance

#### 1.     Fourth Quarter 2024 Results

75.     On February 25, 2025, Krispy Kreme filed with the SEC a Current Report on Form 8-K and attached a press release announcing its fourth quarter and full year 2024 financial results, revealing significant financial deterioration. In the press release, the Company disclosed disappointing results, reporting net revenue of $404.0 million, representing a decline of 10.4% compared to the prior year. The financial deterioration was particularly pronounced in the U.S. segment's profitability with Adjusted EBITDA decreasing 44.0% to $23.6 million.

76.     Despite these declining metrics, the Company maintained an optimistic facade regarding McDonald's progress:

> Global Points of Access grew 24.1%, linked to the Company's accelerating U.S. expansion now reaching more than 1,900 McDonald's restaurants with daily deliveries of Krispy Kreme doughnuts, alongside growth internationally.

77.     The Company also provided 2025 guidance that projected continued growth:

> Krispy Kreme issues the following guidance for the full year 2025 (*vs FY2024*)
> - Net Revenue of $1,550 to $1,650 million
> - Organic Revenue growth of +5% to +7%
> - Adjusted EBITDA of $180 to $200 million
> - Adjusted EPS of $0.04 to $0.08

78.     Following this announcement, Krispy Kreme's shares dropped over 21%, falling from $9.13 per share on February 24, 2025 to close at $7.13 per share on February 25, 2025.

79.     During the corresponding conference call with financial analysts and investors, Defendant Charlesworth continued promoting the partnership expansion and claimed the rollout was "on track" and that feedback from McDonald's was "very positive." He also highlighted the Company's continued growth with national partners: "We continue to expand availability in 2024 as we grew global points of access by 24%. In the U.S., we added more than 2,800 new doors with national partners such as McDonald's, Kroger, Publix and Target, who are eager to expand with us nationally."

80.     Defendant Charlesworth announced the New York City launch and confirmed the rollout timeline stating "[t]his very morning, we launched daily deliveries to approximately 500 McDonald's restaurants in the Greater New York City area and remain on track to reach about 6,000 restaurants by year-end."

81.     Charlesworth also promoted additional expansion opportunities beyond McDonald's: "In 2025, we expect to continue our U.S. expansion with national partners, both existing and new; for example, Costco. An added benefit of this expansion with national partners is the opportunity to identify and close existing underperforming doors, which we expect to do in 2025."

82.     When directly questioned about McDonald's performance, Defendant Charlesworth provided misleading reassurances about the partnership's trajectory:

> [W]e started the phased rollout of McDonald's just in October. We're already in actually two and a half thousand restaurants today. We're launching in New York just today. We expect to be in about 6,000 by the end of the year and 12,000 by the end of 2026. So that rollout's on track.

83.     Most tellingly, however, Defendant Charlesworth acknowledged demand softening dynamics while characterizing them as manageable:

> Now what we're doing now, it's early on in the rollout, we're making sure that we're working with them to maximize the opportunity during the whole rollout phase. Even when that local marketing comes off, when that awareness drops, when it's not as visible on the menu, when naturally demand softens, we're making sure we work with them to get all the way to the national rollout phase. At the end of 2026, when, you know, we'd expect they would start putting on national market.

84.     When asked about the feedback from customers, Defendant Charlesworth maintained his positive assessment and noted further expansion opportunities for the Company, such as with Costco:

> As I said, the feedback from them is very positive. And so the partnership continues to progress very well and it continues to unlock for us expansion opportunities across the country. I mentioned Costco. It's a really big opportunity for us. Wouldn't have been possible without starting the McDonald's rollout target….

### 2.     2024 Form 10-K Filing

85.     On February 27, 2025, Krispy Kreme filed its Annual Report on Form 10-K for the fiscal year ended December 29, 2024 (the "2024 10-K") which was signed by Defendants Ashukian, Andrada, Capel, Charlesworth, Deno, Pleuhs, Bell, Goudet, Michaels, Roberts, Telfer, and Weese. Defendant Charlesworth and Ashukian certified pursuant to the Sarbanes-Oxley Act of 2002 that the 2024 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 2024 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

86.     The 2024 10-K provided extensive details about the McDonald's partnership development:

> In addition to grocery and convenience stores, we are also expanding in DFD channels such as QSR and club membership to further broaden availability of our doughnuts to consumers. This includes our QSR partnership with McDonald's. Following a successful pilot at approximately 160 McDonald's restaurants in Louisville and Lexington, Kentucky and the surrounding area, we entered into an

agreement to work with McDonald's to develop a deployment schedule for a U.S. national rollout of the sale of Krispy Kreme doughnuts at McDonald's restaurants.

87.     The 2024 10-K also detailed the rollout progress through 2024:

The deployment schedule sets forth the anticipated launch period for each McDonald's business unit in the U.S., with phasing expected through the end of fiscal 2026. In the fourth quarter of fiscal 2024, the rollout continued at McDonald's restaurants in places such as Illinois, Indiana, Michigan, Ohio, and Pennsylvania, with total DFD Doors with McDonald's surpassing 1,900 by year-end.

88.     The 10-K also continued to promote the partnership and Krispy Kreme's strong growth:

We added net 3,508 new DFD Doors during the fiscal year as we continue to focus on the deployment of our Hub and Spoke model and our expansion into QSR channels. We plan to continue adding new locations and expanding our digital platform in order to extend the availability of and access to our products. ***We are excited about our partnership with McDonald's and the phasing of the U.S. national rollout, which we believe has validated the attractiveness of the QSR channel.***

**D.     Krispy Kreme's False and Misleading Proxy**

89.     On April 28, 2025, the Company filed its 2025 Proxy Statement with the SEC soliciting shareholder votes to, among other things, elect Defendants Andrada, Capel, Charlesworth, Deno, Grismer, Hees, Pleuhs, Sundaram, and von Bretten to the Board and approve executive compensation. The Proxy Statement was authorized by the Board.

90.     The 2025 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

The Board is responsible for overseeing the Company's processes for assessing and managing risk. The Board's role in the Company's risk oversight process includes reviewing and discussing with management key areas of material risk to the Company. To administer its risk oversight function, the Board has delegated certain oversight responsibilities to its committees. The Board primarily oversees matters related to legal, compliance, strategic, operational, and financial risks. The Audit and Finance Committee oversees the Company's risk management in light of the Company's business strategy, capital strength, and overall risk tolerance, and oversees cybersecurity risks. The Remuneration and Nomination Committee oversees risks related to remuneration plans, policies, and practices applicable to

officers and employees and other talent-related matters, as well as risks associated with Board independence and governance. Committees report to the full Board regarding their respective considerations, actions, and recommendations, as applicable.

91.     The 2025 Proxy Statement represents that the Audit Committee is engaged in vigorous oversight over risks to the Company through overseeing "the integrity of the Company's financial reporting process and systems of internal controls, including the integrity of the Company's financial statements, in consultation with independent auditors and the Company's legal, accounting, and internal audit departments."

92.     The 2025 Proxy Statement represents that the Company is "committed to strong corporate governance policies and practices."  Further, the Proxy represents that the "Board is responsible for broad corporate policy and the overall performance of the Company through oversight of management and stewardship of the Company."

93.     The foregoing statements in the 2025 Proxy Statement were false and misleading and omitted material information. Contrary to the representations made in the 2025 Proxy Statement, the Krispy Kreme Board and Defendant Ashukian were required but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the 2025 Proxy Statement contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee and the Company's commitment to good corporate governance practices.

94. On June 20, 2025, the Company filed with the SEC a Current Report on Form 8-K, announcing the election of the Defendants Andrada, Capel, Charlesworth, Deno, Grismer, Hees, Pleuhs, Sundaram, and von Bretten to the Board, and the approval of executive compensation pursuant to the solicitations in the 2025 Proxy Statement.

**E.      The Company Reports Further Losses And Declining Revenue And Company Officers Acknowledge Fundamental Issues With The McDonald's Partnership**

95. On May 8, 2025, Krispy Kreme filed with the SEC a Current Report on Form 8-K and attached a press release announcing devastating first quarter 2025 financial results that finally revealed the truth about the McDonald's partnership. The Company disclosed significant financial deterioration, reporting a "net loss of $33.4 million, compared to prior year net loss of $6.7 million". More significantly, Krispy Kreme reported that "net revenue was $375.2 million . . . a decline of 15.3%".

96. The press release provided comprehensive details about the financial performance, with the following highlights (vs Q1 2024):

- Net revenue of $375.2 million
- Organic revenue declined 1.0% to $374.7 million
- GAAP net loss of $33.4 million
- Adjusted EBITDA of $24.0 million
- GAAP cash used for operating activities of $20.8 million
- Global Points of Access ("POA") increased 3,168, or 21.4%, to 17,982

97. Most damaging, the Company made shocking admissions about the McDonald's partnership's fundamental problems:

As of March 30, 2025, Krispy Kreme doughnuts are now available in more than 2,400 McDonald's restaurants. The Company is reassessing the deployment schedule together with McDonald's while it works to achieve a profitable business model for all parties and does not expect to launch in any additional restaurants in the second quarter of 2025.

98.     Despite acknowledging these problems, the Company attempted to maintain optimism about the long-term prospects stating that "Krispy Kreme continues to believe in the long-term opportunity of profitable growth through the U.S. nationwide expansion including McDonald's."

99.     The Company then delivered the devastating blow to investor confidence by withdrawing all financial guidance:

> Given macroeconomic softness and the uncertainty around the McDonald's deployment schedule, the Company is withdrawing its prior full year outlook and not updating it at this time.

100.     During the conference call with financial analysts and investors that same day, Defendant Charlesworth finally admitted that the partnership suffered from fundamental problems, noting "that after the initial marketing launch, demand dropped below our expectations, requiring intervention to deliver sustainable profitable growth." He stated that the Company was working with "McDonald's to increase sales by stimulating higher demand and cutting costs by simplifying operations." He also acknowledged the partnership was being fundamentally reassessed: "At the same time, we are reassessing our deployment schedule together with McDonald's while we work to achieve a profitable business model for all parties. Given this, we do not expect to launch any additional restaurants in Q2."

101.     Despite these admissions, Charlesworth attempted to maintain long-term optimism stating that "we continue to believe in the long term opportunity of profitable growth through our US nationwide expansion including McDonald's."

102.     Defendant Ashukian revealed additional concerning financial metrics during his segment overview:

> Turning to the US segment, growth in points of access and GFD revenue was more than offset by the aforementioned consumer softness and planned reduction of discount days resulting in reduction Organic revenue decline of 2.6%.

103. Ashukian also detailed the significant impact on profitability and key performance metrics with adjusted EBITDA declining to $15.9 million due in part to "softness in our retail segment" and "costs associated with our U.S. nationwide expansion." In addition, "[a]verage revenue per door per week, or APD, was $587, down from the same period 1 year ago, reflecting the shift in customer mix as we introduced McDonald's."

104. Ashukian concluded by acknowledging the withdrawal of all financial guidance due to the McDonald's uncertainty:

> As Josh mentioned, pursuing quality growth means scaling with strategic national partners and also focusing on our core offerings. Given the scope of these actions amid macroeconomic softness and uncertainty around McDonald's, we are withdrawing our prior full year outlook and not updating it at this time.

105. Following the May 8, 2025 revelations, Krispy Kreme's stock price fell dramatically by 24.71%, declining from a closing price of $4.33 per share on May 7, 2025 to $3.26 per share on May 8, 2025.

106. Industry analysts expressed shock at the rapid deterioration. JP Morgan commented on the execution problems and strategic missteps: "Execution was not perfect by any means but a more aggressive focus (and transparency) on DFD churn is expected, which continues to remain a focus area for us."

107. JP Morgan further highlighted the fundamental flaws in the rollout strategy: "This quarter taught the painful reality of not only the ***underestimated execution risk*** but also the uneven store/store demand of the MCD rollout plan. Krispy Kreme was intended to be in nearly all MCD in a given market to realize scale around marketing and distribution."

108. Truist Securities was even more critical, expressing disbelief at the speed of the partnership's collapse:

> We are shocked by the speed at which the story fell apart. Management provided a "everything going as planned message" on the 4Q earnings call in early February

and at several conferences YTD, and this is one area not particularly impacted by tariffs or new items from the administration.

109. Truist Securities concluded with a damning assessment of management credibility: "We no longer have high conviction in management's previously stated strategy and execution of these initiatives, and it will likely take several quarters before we or investors can regain confidence."

### F. Securities Class Action Lawsuits Are Brought Against Krispy Kreme And Certain Officers

110. As a result of these events, securities class action lawsuits began to be filed against the Company and Charlesworth, and Ashukian. On May 16, 2025, a securities class action lawsuit was filed captioned *Cameron v. Krispy Kreme, Inc*., Case No. 3:25-cv-00332 (W.D.N.C.) on behalf of persons and entities that purchased or otherwise acquired Krispy Kreme securities between February 25, 2025 and May 7, 2025, inclusive. The lawsuit asserts violations of Section 10(b) of the Exchange Act and Rule 10b5 promulgated thereunder against the Company and the named officers and violations of Section 20(a) against Charlesworth and Ashukian.

111. On June 30, 2025, a second securities class action lawsuit captioned *Leodler v. Krispy Kreme, Inc*., Case No. 3:25-cv-00469 (W.D.N.C.) was filed against the same defendants with similar claims on behalf of all investors who purchased or otherwise acquired Krispy Kreme securities between March 26, 2024 to May 7, 2025, inclusive.

112. The Company has incurred, and will continue to incur, substantial costs to defend itself and its officers in the pending securities class actions, and is exposed to massive potential class-wide liability.

### G. Krispy Kreme And McDonald's Ends Their Partnership And Company Officers Resign

113.    On June 24, 2025, the Company filed with the SEC a Current Report on Form 8-K announcing that the two companies had decided to end their partnership, effective July 2, 2025.

114.    On July 3, 2025, the Company filed with the SEC a Current Report on Form 8-K announcing the sudden resignation of Defendant Ashukian, effective July 11, 2025. The Company also announced that the Company's Chief Growth Officer, David Skena, was resigning effective July 11, 2025.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

115.    Plaintiff brings this action derivatively and for the benefit of Krispy Kreme to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Krispy Kreme and violations of Sections 20(a), and 14(a) of the Exchange Act, and SEC Rules 10b-5 and 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and to seek contribution for violations of Section 21D of the Exchange Act, as well as the aiding and abetting thereof.

116.    Krispy Kreme is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

117.    Plaintiff is, and has been at all relevant times, a stockholder of Krispy Kreme and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of Krispy Kreme in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

118.    Demand upon the members of the Board  to institute this action against the Individual Defendants would be futile and is, therefore, excused. The members of the Board  are neither disinterested nor independent.

## A. Demand Upon Defendant Charlesworth Is Excused

119.    Defendant Charlesworth is the President and CEO of Krispy Kreme and a director since January 2024. Before becoming President and CEO, he served in several other Company executive roles, including Global President, Chief Operating Officer, Chief Financial Officer, and Corporate Secretary of Krispy Kreme. Therefore, Charlesworth is not independent. As an employee of Krispy Kreme, the Company provides Charlesworth with his principal occupation, from which he receives substantial compensation. In 2023 and 2024, he received $11,260,174 and $2,510,455 in compensation, respectively. Indeed, Krispy Kreme's 2025 Proxy Statement does not list Charlesworth as an independent director.

120.    Charlesworth is a named defendant in the pending securities class action lawsuits. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

121.    Charlesworth also engaged in improper insider sales while in possession of material non-public information about the Company, netting total proceeds of approximately $58,000. Thus, Charlesworth had an incentive to inflate Krispy Kreme's stock price through issuing and allowing false and misleading statements regarding the Krispy Kreme's partnership with McDonald's in order to profit from insider sales. Through material omissions and misrepresentations to the market about the rollout of the McDonald's partnership and the related impact on Krispy Kreme's financials, Charlesworth sold Krispy Kreme stock at artificially inflated prices, reaping a material personal benefit not shared with other Krispy Kreme stockholders from the misconduct pled herein.

122.    In addition to lacking disinterest due to his receipt of material personal benefits as a result of the misconduct challenged herein, Charlesworth faces a substantial likelihood of

liability because he breached his fiduciary duties by trading on material, nonpublic information and by disseminating false and misleading information to the market.

123.    Charlesworth authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

124.    Charlesworth benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Krispy Kreme Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

125.    Charlesworth, as a director of Krispy Kreme, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

126.    Charlesworth is neither disinterested nor independent. Any demand upon Defendant Charlesworth is futile and, thus, excused.

**B.    Demand Upon Defendant Andrada Is Excused**

127.    Andrada authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

128.    Andrada benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Krispy Kreme Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

129. Andrada, as Chair of the Renumeration and Nomination Committee had the duty, among others, to ensure the implementation and effectiveness of Krispy Kreme's Code of Conduct and Corporate Governance Principles. Andrada utterly failed to perform these duties.

130. Andrada, as a director of Krispy Kreme, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

131. Andrada is neither disinterested nor independent. Any demand upon Defendant Andrada is futile and, thus, excused.

### C. Demand Upon Defendant Capel Is Excused

132. Capel authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

133. Capel benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Krispy Kreme Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

134. Capel is also a Senior Partner at JAB Holdings Company, which owns approximately 44% of Krispy Kreme common stock according to the 2025 proxy statement, and serves as its anchor shareholder, having taken the Company private in 2016 and later returning it to the public markets in 2021. This substantial ownership stake and control preclude her from acting with the required independence and disinterest with regard to the decision to initiate

litigation against members of the Board or senior management for alleged breaches of fiduciary duty, as her interests are directly aligned with JAB and its significant influence over Krispy Kreme.

135. Defendants Capel and von Bretten have a professional relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. Capel and von Bretten are both Senior Partners at JAB, where they work together closely on investment decisions, strategic oversight, and the management of JAB's portfolio companies. Their ongoing collaboration as part of JAB's senior leadership team  compromises their ability to impartially consider litigation against one another.

136. Further, Defendant Goudet is also a Senior Investment Advisor at JAB and was previously Managing Partner and CEO, working alongside Capel and von Bretten. Defendant Bell also has a strong connection to JAB and Capel, Goudet, and von Bretten working as a Senior Partner at JAB from March 2021 to March 2025. Therefore, based on these connections, Capel is precluded from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against Goudet and Bell.

137. Capel serves as a director of Panera Brands, Inc. ("Panera"), a company that, like Krispy Kreme, is controlled by JAB, where Capel is also a Senior Partner. As a result, Capel's ongoing service on the board of Panera further entrenches her professional and fiduciary ties to JAB and its portfolio companies beyond Krispy Kreme. These overlapping directorships and shared control by JAB create disabling conflicts that compromise Capel's ability to exercise the requisite independence and disinterest when considering whether to institute litigation on behalf of Krispy Kreme against the Individual Defendants.

138. Capel, as a director of Krispy Kreme, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying

with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

139. Capel is neither disinterested nor independent. Any demand upon Defendant Capel is futile and, thus, excused.

### D. Demand Upon Defendant Deno Is Excused

140. Deno authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

141. Deno benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Krispy Kreme Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

142. Defendants Deno and Grismer have a longstanding professional relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. Grismer and Deno worked together for several years as senior executives at Yum! Brands, where they collaborated closely in finance and operations.

143. Deno serves as a director of Panera, a company that, like Krispy Kreme, is controlled by JAB. As a result, Deno's ongoing service on the board of Panera further entrenches his professional and fiduciary ties to JAB and its portfolio companies beyond Krispy Kreme. These overlapping directorships and shared control by JAB create disabling conflicts that compromise Deno's ability to exercise the requisite independence and disinterest when considering whether to institute litigation on behalf of Krispy Kreme against parties affiliated with JAB or Panera.

144. Deno, as a Chair of the Audit and Finance Committee, had duties regarding oversight of the risks facing the Company and Krispy Kreme's compliance with relevant laws, rules, and regulations. Deno utterly failed to perform these essential duties.

145. Deno, as a director of Krispy Kreme, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

146. Deno is neither disinterested nor independent. Any demand upon Defendant Deno is futile and, thus, excused.

**E.       Demand Upon Defendant Pleuhs Is Excused**

147. Pleuhs authorized the 2025 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

148. Pleuhs benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Krispy Kreme Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

149. Pleuhs serves as a director of Panera, a company that, like Krispy Kreme, is controlled by JAB. As a result, Pleuhs' ongoing service on the board of Panera further entrenches his professional and fiduciary ties to JAB and its portfolio companies beyond Krispy Kreme. These overlapping directorships and shared control by JAB create disabling conflicts that compromise Pleuhs' ability to exercise the requisite independence and disinterest when considering whether to institute litigation on behalf of Krispy Kreme against parties affiliated with JAB or Panera.

150.     Pleuhs, as a member of the Renumeration and Nomination Committee had the duty, among others, to ensure the implementation and effectiveness of Krispy Kreme's Code of Conduct and Corporate Governance Principles. Pleuhs utterly failed to perform these duties.

151.     Pleuhs, as a member of the Audit and Finance Committee, had duties regarding oversight of the risks facing the Company and Krispy Kreme's compliance with relevant laws, rules, and regulations. Pleuhs utterly failed to perform these essential duties.

152.     Pleuhs, as a director of Krispy Kreme, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

153.     Pleuhs is neither disinterested nor independent. Any demand upon Defendant Pleuhs is futile and, thus, excused.

### F.     Demand Upon Defendant Grismer Is Excused

154.     Grismer benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing election to the Krispy Kreme Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

155.     Defendants Grismer and Deno have a longstanding professional relationship which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other. Grismer and Deno worked together for several years as senior executives at Yum! Brands, where they collaborated closely in finance and operations.

156.     Grismer, as a director of Krispy Kreme, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

157.     Grismer is neither disinterested nor independent. Any demand upon Defendant Grismer is futile and, thus, excused.

### G.     Demand Upon Defendant Hees Is Excused

158.     Hees benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing election to the Krispy Kreme Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

159.     Hees, as a director of Krispy Kreme, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

160.     Hees is neither disinterested nor independent. Any demand upon Defendant Hees is futile and, thus, excused.

### H.     Demand Upon Defendant Sundaram Is Excused

161.    Sundaram benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing election to the Krispy Kreme Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

162.    Sundaram, as a director of Krispy Kreme, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

163.    Sundaram is neither disinterested nor independent. Any demand upon Defendant Sundaram is futile and, thus, excused.

## I.    Demand Upon Defendant von Bretten Is Excused

164.    Von Bretten benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing election to the Krispy Kreme Board through the false and misleading statements and material omissions in the 2025 Proxy Statement.

165.    Von Bretten is a Senior Partner at JAB, which is Krispy Kreme's anchor shareholder and owns approximately 44% of Krispy Kreme common stock according to the 2025 proxy statement. As a Senior Partner at JAB, von Bretten is directly affiliated with the entity that exercises significant control over Krispy Kreme, having taken the Company private in 2016 and later returning it to the public markets in 2021. This substantial ownership stake and influence preclude him from acting with the required independence and disinterest with regard to the decision to initiate litigation against other members of the Board or senior management for alleged

breaches of fiduciary duty, as his interests are directly aligned with JAB and its significant influence over Krispy Kreme.

166. Defendants von Bretten and Capel have a professional relationship, based on their work together as Senior Partners at JAB, which precludes them from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against each other.

167. Further, Defendant Goudet is also a Senior Investment Advisor at JAB and was previously Managing Partner and CEO, working alongside Capel and von Bretten. Defendant Bell also has a strong connection to JAB and Capel, Goudet, and von Bretten working as a Senior Partner at JAB from March 2021 to March 2025. Therefore, based on these connections, von Bretten is precluded from acting with the required independence and disinterest with respect to considering whether to institute lawsuits against Goudet and Bell.

168. Von Bretten, as a director of Krispy Kreme, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

169. Von Bretten is neither disinterested nor independent. Any demand upon Defendant von Bretten is futile and, thus, excused.

## VII.   CLAIMS FOR RELIEF

## FIRST CLAIM
### Against Defendants Ashukian, Andrada, Capel, Charlesworth, Deno, Pleuhs, Bell, Goudet, Michaels, Roberts, Telfer, and Weese for Violations of Section 14(a) of the Exchange Act

170. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

171. The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

172. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

173. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

174. Under the direction of Defendants Ashukian, Andrada, Capel, Charlesworth, Deno, Pleuhs, Bell, Goudet, Michaels, Roberts, Telfer, and Weese, the 2025 Proxy Statement failed to

disclose that the Krispy Kreme Board and Defendant Ashukian violated their fiduciary duties to Krispy Kreme and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the 2025 Proxy Statement contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee and the Company's commitment to good corporate governance practices.

175.    In the exercise of reasonable care, Defendants Ashukian, Andrada, Capel, Charlesworth, Deno, Pleuhs, Bell, Goudet, Michaels, Roberts, Telfer, and Weese should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading and omitted material information.

176.    The false and misleading statements in, and information omitted from, the 2025 Proxy Statement were material to Krispy Kreme's stockholders in determining whether to, among other things, elect Defendants Andrada, Capel, Charlesworth, Deno, Grismer, Hees, Pleuhs, Sundaram, and von Bretten to the Board and approve executive compensation.

177.    The material misstatements and omissions in the 2025 Proxy Statement damaged the Company.

178.    Plaintiff, on behalf of Krispy Kreme, seeks relief for damages inflicted upon the Company based on the misleading 2025 Proxy Statement in connection with the improper election of Defendants Andrada, Capel, Charlesworth, Deno, Grismer, Hees, Pleuhs, Sundaram, and von Bretten to the Board and the approval of executive compensation.

## SECOND CLAIM
### Against The Individual Defendants for Contribution
### Under Section 21D of the Exchange Act

179.    The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

180.    Krispy Kreme is named as a defendant in related securities fraud class action lawsuits that allege and assert claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Krispy Kreme is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

181.    As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Krispy Kreme's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

182.    The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

The Individual Defendants have damaged the Company and are liable to the Company for contribution.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    The Individual Defendants, by virtue of their positions with Krispy Kreme and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Krispy Kreme and officers and directors who made or allowed the dissemination of the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Krispy Kreme to engage in the illegal conduct and practices complained of herein.

185.    Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duty**

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants owed and owe fiduciary duties to Krispy Kreme.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Krispy Kreme the highest obligation of good faith and loyalty in the administration of Krispy Kreme's affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the

Board's obligations, would have prevented the misconduct and consequential harm to Krispy Kreme alleged herein.

188. The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

189. The Individual Defendants each violated their fiduciary duties to Krispy Kreme and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Krispy Kreme's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the Company's partnership with McDonald's; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

190. Defendants Ashukian, Andrada, Capel, Charlesworth, Deno, Pleuhs, Bell, Goudet, Michaels, Roberts, Telfer, and Weese further breached their fiduciary duties to Krispy Kreme by, *inter alia,* making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

191. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Krispy Kreme's affairs and in the use and preservation of Krispy Kreme's assets.

192. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Krispy Kreme has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

193. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### FIFTH CLAIM
#### Against The Individual Defendants For Waste of Corporate Assets

194. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

195. As a further result of the foregoing, Krispy Kreme will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the securities class action lawsuits), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

196. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

197. Plaintiff, on behalf of Krispy Kreme, has no adequate remedy at law.

### SIXTH CLAIM
#### Against The Individual Defendants For Aiding And Abetting

198. Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

199. Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

200. In committing the wrongful acts, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

201.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

202.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Krispy Kreme, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Krispy Kreme;

(c)    Declaring that Defendants Ashukian, Andrada, Capel, Charlesworth, Deno, Pleuhs, Bell, Goudet, Michaels, Roberts, Telfer, and Weese violated Section 14(a) of the Exchange Act;

(d)    Declaring that the Individual Defendants violated Sections 20(a) and 21D of the Exchange Act;

(e)    Determining and awarding to Krispy Kreme the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(f)    Directing Krispy Kreme to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to protect the Company and its stockholders from a repeat of the damaging events described herein;

(g)     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(h)     Awarding to the Company restitution from Defendants, and each of them;

(i)     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(j)     Granting such other and further relief as the Court deems just and proper.

## IX.     JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: August 19, 2025.

**OF COUNSEL:**

**/s/ John F. Bloss**
John F. Bloss
N.C. Bar No 23947
HIGGINS BENJAMIN, PLLC
301 North Elm Street, Suite 800
Greensboro, NC 27401
Phone: (336) 273-1600
Facsimile: (336) 274-4650
Email: jbloss@greensborolaw.com

**WEISS LAW**[*]
David C. Katz[*]
Mark D. Smilow[*]
305 Broadway, 7th Fl.
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
msmilow@weisslawllp.com

Joshua M. Rubin[*]
Jonathan Meer[*]
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com
jmeer@weisslawllp.com

*Counsel for Plaintiff*

*Applications for admission *pro hac vice* forthcoming

## **VERIFICATION**

I, Stephen Bushansky, hereby verify that I am a stockholder of Krispy Kreme, Inc. (the "Company"), having acquired the Company's shares in July 2021 and having held them continuously at all relevant times herein. I am ready, willing, and able to pursue this stockholder derivative action on behalf of and for the benefit of the Company. I have reviewed the allegations in the attached Verified Stockholder Derivative Complaint (the "Complaint"), and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason, I believe them to be true. Having received a copy of the Complaint, and having reviewed it with my counsel, I hereby authorize its filing on my behalf.

I verify under penalty of perjury that the foregoing is true and correct. Executed on August 18, 2025.



_____
Stephen Bushansky